UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLOBAL REINSURANCE CORPORATION OF AMERICA, as successor-in-interest to CONSTITUTION REINSURANCE CORPORATION, ) ) ) ) ) | |
| Plaintiff, ) | CIVIL ACTION NO. 1:22-cv-3785 |
| ) | |
| v. ) | |
| ) | |
| NATIONAL INDEMNITY CO., ) | |
| ) | |
| Defendant. ) | |

## **COMPLAINT**

This is an action for declaratory relief. Plaintiff, Global Reinsurance Corporation of America, as successor-in-interest to Constitution Reinsurance Corporation ("**Global**"), by and through its undersigned attorneys, alleges as follows:

### **Nature Of Complaint**

1. On April 19, 2022, defendant National Indemnity Co. ("**NICO**") entered into a certain agreement ("*Agreement*") with the State of Montana ("**State**") in order to settle and fully resolve NICO's potential liability to the State in connection with the Libby Mine Claims (as defined in such *Agreement*). NICO's liability was alleged to have arisen as a consequence of its issuance of a general liability insurance contract to the State covering the period between July 1, 1973 and July 1, 1975.

2. The settlement envisioned by the *Agreement* is subject to court approval, and NICO has informed Global that, following such approval, NICO will seek reinsurance cover

from Global for all or some of the amounts paid by NICO to the State pursuant to a facultative reinsurance certificate issued by Global's predecessor-in-interest.

3.      As a result of the questions, issues and controversies more fully described below, Global hereby seeks declaratory relief in the form of a judgment establishing its rights, duties, responsibilities and obligations *vis-a-vis* NICO, if any.

**Parties, Jurisdiction, And Venue**

4.      Plaintiff Global is a corporation organized under the laws of the state of New York, and with a principal place of business within the commonwealth of Pennsylvania.

5.      Defendant NICO is a corporation organized under the laws of the state of Nebraska, and with a principal place of business within such state.

6.      The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.      Because there is complete diversity of citizenship between all parties to this proceeding, this Court has jurisdiction under 28 U.S.C. § 1332(a)(2).

8.      Venue is proper in this district under 28 U.S.C. § 1391(a) and (b) because, respectively, NICO "resides" in this district (in that it is subject to this Court's personal jurisdiction as regards the matter at bar), and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**Factual Background**

**I.      NICO Insures the State**

9.      On or about August 1, 1973, NICO issued *Montana Public Entity Special Comprehensive Liability Policy*, Policy No. PE 250001 ("***Policy***"), to the State, which *Policy* is hereby incorporated by reference.

10.      The policy period under the *Policy* initially ran from July 1, 1973 to July 1, 1976 but, pursuant to the *Policy's* terms, NICO unilaterally cancelled coverage effective July 1, 1975.

11.     Pursuant to the *Policy's* terms, NICO agreed to pay "all sums" for bodily injury "caused by an occurrence" for which the State "shall become legally obligated to pay as damages."

12.     In addition, and again pursuant to the *Policy*, NICO had the "right and duty to defend any suit against the [State] seeking damages on account of bodily injury."

13.     The *Policy's* limits were stated to be $3,000,000.00 per occurrence and in the aggregate.

**II.     NICO Obtains Reinsurance Coverage**

14.     Reinsurance is a type of contract for indemnity by which an insurer transfers to a reinsurer some or all of the risk that the insurer assumed under one or more insurance policies. The scope and amount of the reinsurance coverage is determined by, and subject to, the terms, conditions, and limits of a reinsurance agreement, which governs the relationship between the insurer and the reinsurer.

15.      In a reinsurance relationship, the original insurer is known as the "cedent" or "ceding insurer" and it is said to "cede" risk and premium to the reinsurer.  In this case, NICO, as cedent, transferred certain risks discussed below to several reinsurers, including Global (as a successor-in-interest), subject to the terms, conditions and limits of the reinsurance agreement entered into by NICO and Global's predecessor-in-interest.

16.     The type of reinsurance provided to NICO in this matter is referred to as "facultative reinsurance."  Facultative reinsurance is a type of reinsurance coverage that applies to a single policy or risk.

17.     Global's predecessor-in-interest, Constitution Reinsurance Corporation, issued facultative Certificate No. 61369 ("***Global Certificate***") to NICO for the period July 1, 1973 to July 1, 1975.  A true and correct copy of the *Global Certificate* is attached hereto as <u>Exhibit A</u>. Pursuant to the *Global Certificate*, coverage was provided to NICO as follows:

"$500,000 each occurrence and in the aggregate where applicable
part of $1,000,000 which is excess of $2,000,000 which in turn is
excess of underlying insurance"

### III.    The Underlying Insurance Dispute Between NICO and the State

18.    As early as the 1950s, and continuing through the 1970s, the State, acting
pursuant to its regulatory authority, conducted inspections of certain mining and milling
operations in and around Libby, Montana ("**Libby Mine**").

19.    Beginning in 2000, individuals who were suffering from asbestos-related injuries
allegedly resulting from exposure at or around the Libby Mine ("**Libby Claimants**") began to
file tort claims against the State.  These claims covered periods of time prior to, during, and after
the *Policy's* term.

20.    In general, the Libby Claimants alleged that the State had been negligent because,
despite its inspections, it had failed to warn the Libby Claimants of the dangers of asbestos
exposure, thereby resulting in bodily injury to such claimants ("**Libby Claims**").

### IV.    The State Discovers the Existence of the *Policy* and Informs NICO

21.    In June 2002, the State, following a search of its records, discovered the *Policy's*
declaration page.

22.    On June 27, 2002, the State, acting through legal counsel, wrote to NICO and
tendered the Libby Claims.  In particular, the State's correspondence provided as follows: "[W]e
are tendering these claims to [NICO] . . . it appears that [NICO] provided comprehensive general
liability insurance to the State from on or about 1973 through 1975 or 1976."

23.     The State's correspondence listed eighteen (18) suits that had been filed and, in addition, included copies of twelve (12) of the eighteen (18) filed complaints.  The State further advised NICO that the State had filed motions to dismiss the various complaints.

24.     In follow up correspondence sent shortly thereafter, the State provided NICO with copies of five of the six (6) remaining filed complaints.

**V.     The State Initially Prevails on Its Motion to Dismiss Certain of the Libby Claims And An Appeal Is Taken**

25.     In August 2002, the Montana trial court granted the State's motion to dismiss eight of the pending Libby Claims, *viz.* Cause Nos. BDV 2001-423, 264, 523, 678, 667, 577; ADV 2001-623; and CDV 2001-699 (collectively, the "***Orr* Proceeding**").

26.     The various claimants in the *Orr* Proceeding filed a timely appeal to the Supreme Court of the State of Montana ("**Montana Supreme Court**").

27.     Although unaware of the trial court's decision in the *Orr* Proceeding, in November 2002, NICO began to reserve for the Libby Claims.

28.     On December 12, 2002, NICO learned of the trial court's decision in the *Orr* Proceeding and immediately contacted the State.  NICO asked the State to keep NICO informed of developments in that litigation.  Just a short time later, on December 20, 2002, NICO increased its reserves with respect to the Libby Claims eight-fold.

29.     In June 2003, the Montana Supreme Court heard argument in the *Orr* Proceeding and approximately eighteen (18) months later, in December 2004, it reversed the trial court.

30.     The State then petitioned the Montana Supreme Court for rehearing, which petition was denied on February 2, 2005.

## VI.    Communications Between NICO And The State Regarding The Libby Claims Increase

31.    At about the time of the denial of the State's petition for rehearing, NICO learned of the Montana Supreme Court's ruling in the *Orr* Proceeding.

32.    On March 17, 2005, the State contacted NICO for the first time in approximately seventeen (17) months.  In its correspondence of that date, the State explained that the Montana Supreme Court had ruled in favor of the Libby Claimants, denied rehearing, and remanded the proceedings.  In that same correspondence, the State provided an updated list of all Libby Claims, reported on the status of the original (18) claims that it had earlier advised NICO of, and notified NICO of an additional seventy-two (72) Libby Claims.  Finally, after referencing the State's June 27, 2002 correspondence, the State inquired as to whether NICO was accepting the State's tender and would be providing both a defense and coverage *vis-à-vis* the Libby Claims.

33.    At about this point in time, the State also began to forward to NICO any Libby Claimant complaints and notices of claim as the same were received by the State.

34.    On April 7, 2005, NICO informed the State that NICO lacked sufficient information "to determine the respective obligations of [NICO] and the State under the Policy with respect to the pending claims."  NICO requested that the State assist NICO by gathering information that would allow NICO "to promptly and accurately determine and perform all of [NICO's] duties under the contract of insurance and applicable law."  NICO's letter contained an itemization of informational and documentary requests, and finished by stating, "[u]nder the present circumstances, [NICO] is reserving all of its rights with respect to the Policy and the claims asserted against the State."

35.    On June 18, 2005, NICO informed the State that NICO would defend the State in connection with Libby Claims "subject to a complete reservation of rights under the Policy and applicable state law."  In correspondence of such date, NICO discussed the coverage issues that it would be reserving, including the potential exclusion of claims: (a) under the definition of "occurrence;" (b) pursuant to the *Policy's* pollution exclusion; (c) on the basis of any loss known by the State; and (d) with respect to claims that exceeded the *Policy* limit of $3 million "for all bodily injuries and property damage resulting from an occurrence."  Additionally, NICO posited that "all defense costs, as well as any losses to which the Policy applies, must be allocated pro rata based on time on the risk," because "an equitable allocation of time on the risk would include self-insurance in the same manner as periods of commercial insurance was in force."  Finally, NICO reserved the right to seek reimbursement if NICO was determined not to owe the State a defense, or if liability limits had been exhausted.

36.    In November 2005 correspondence, the State rejected NICO's defense offer, stating:

> Your [July 18, 2005] letter provides that with respect to the Libby [Claims] . . . , [NICO] will defend the State . . . against those claims subject to a complete reservation of rights under the policy of insurance issued to the State . . . by [NICO] and applicable state law.  Your letter further provides that [NICO] believes all defense costs must be allocated pro-rata based on time on the risk.  Your letter also provides that  no  defense is  owed after [NICO] pays what it asserts are the liability limits, and reserves the right to seek reimbursement  of  defense  costs  and  payments  made  after exhaustion of liability limits.  The State . . . respectfully disagrees with  [NICO's]  positions.   The State  .  .  .  further  believes  a reservation of rights is not appropriate.

37.    In both meetings and communications during early 2006, NICO continued to assert that it had no obligation to indemnify the State in connection with the Libby Claims but,

nevertheless, was defending the State and, as such, needed to be involved in any settlement discussions between the State and the Libby Claimants.

38.    In April 6, 2006 correspondence, NICO expressed "surprise" at the State's claim that NICO was <u>not</u> defending the State.  In reply, on April 10, 2006, the State reaffirmed its position that it had tendered the Libby Claims in 2002, and further stated:

> Your letter indicates that [NICO]. . . is surprised by the State's position that [NICO] is not defending the State.  That statement is puzzling.  As your letter indicates, while [NICO] has made a proposal to provide a limited, apportioned defense, at no time has it proposed to provide a complete defense to the State.
>
> *            *            *
>
> . . . In the July 20, 2005 meeting, in support of your proposal to contribute to the defense of the costs of these claims you discussed three fractions as examples of the portion [NICO] might contribute. . . .
>
> The State's position has been clear and consistent . . . that the State requests [NICO] to provide a complete defense and to indemnify it completely for the Libby [C]laims.  Given the positions and proposals [NICO] has taken and presented with regard to the State's clear and unequivocal tender request, [NICO] can claim no surprise about the fact that it is not defending the State . . . .

39.    Representatives of NICO and the State met on April 18, 2006, to discuss NICO's rights and obligations under the *Policy*.  They also conducted a conference call on the same issues the following day.

40.    NICO then followed up on these two days of communications with a May 10, 2006 letter to the State.  In that letter, NICO stated that it "was willing to pay 100% of the cost of defending the State" in connection with the Libby Claims, subject to NICO's reservation of rights.  The letter went on to say that NICO wanted "to leave no doubt whatsoever regarding the

commitment of [NICO] to defend the State." The letter requested copies of the State's counsel's engagement agreements, along with "invoices, summaries or other information concerning the State's defense costs to date" (which the State had thus far refused to provide), so that NICO could begin analyzing those costs. NICO's April 20, 2006 letter went on to say that the State's "reference to having tendered these claims to [NICO] in 2002 is disingenuous at best." In the alternative, NICO offered to pay a portion of the State's defense costs while waiving any right of reimbursement. NICO stated, however, that it was unable to agree to the State's request for indemnification against the Libby Claims with no reservation of rights.

41.    On May 19, 2006, the State rejected NICO's May 10 proposals, and reiterated its demand that NICO fully defend the State and agree to indemnify it without reservation.

### VII.    Settlement of the Libby Claims

42.    In June 2008, certain of the Libby Claimants entered into settlement discussions with NICO and the State.

43.    After the State expressed a desire for a total resolution of all of the Libby Claims, the Libby Claimants made a global settlement demand.

44.    In June 2009, NICO offered, in exchange for a complete release by the State, to contribute the *Policy's* $3 million occurrence limit to a settlement, all while continuing to contest the validity of the Libby Claims and to assert its coverage defenses.

45.    This offer was declined, and NICO subsequently made a series of increasing offers in the run-up to a three-day mediation session conducted between NICO, the Libby Claimants and the State on November 16-18, 2009.

46.     On the final day of that mediation, the State and the Libby Claimants agreed on a global settlement totaling $43 million.

47.     NICO contributed $16.1 million towards that settlement, subject to a reservation of rights (including recoupment).  That amount was arrived at based on NICO's valuation of the claims at $13.1 million, and the State's representation that it had expended $3 million in defense costs.

48.     The settlement was subsequently approved by the Court and NICO remitted its $16.1 million contribution on or about September 30, 2011.

**VIII.   Parallel Discussions Between The State And NICO Regarding NICO's *Policy* Obligations**

49.     While the settlement discussions between the State, NICO and the Libby Claimants were underway, NICO was independently engaged in negotiations with the State regarding NICO's obligations under the *Policy*.

50.     At about the time that NICO made its $3 million settlement offer above-referenced, the State suggested that NICO and the State seek a judicial resolution of their mutual rights and obligations as regards the *Policy*.

51.     NICO was generally agreeable to this course of action and, on July 24, 2009, it suggested that it and the State first enlist the services of a neutral mediator.

52.     The State and NICO met on October 7, 2009, to discuss a resolution of all coverage issues in connection with the Libby Claims.  NICO made several offers to the State, all of which were rejected.  However, the discussions between NICO and the State did lead to NICO's $16.1 million settlement contribution as described above.

53.     In June 2010, NICO and the State entered into a tolling agreement to toll applicable statutes of limitation on their respective claims against each other.  Pursuant to that agreement, the parties agreed that the State had "tendered to [NICO] the defense and indemnity of . . . the Libby Mine Claims," and that "[NICO] disputes that it has any obligations under the Policy or otherwise with respect to the Libby Mine Claims."

54.     In October 2010, pending judicial approval of the $43 million settlement, the parties to that settlement entered an  "Amended Memorandum of Understanding," pursuant to which it was agreed that  "any portion of  the  $16.1 million initially advanced by [NICO] . . . shall not constitute an acceptance by the State of any defense offered by [NICO]."  Both the State and NICO reserved the right to seek reimbursement for all advanced funds from each other, and reserved "all rights, claims and defenses either of them have or may have or assert against the other."  NICO also agreed to respond upon tender for defense of all future Libby Claims.

## IX.    The Failed Mediation And Subsequent Litigation Between NICO And The State

55.     The State and NICO mediated their disagreements regarding their respective rights/obligations under the *Policy* without success.

56.     Thereafter, on February 23, 2012, NICO filed a declaratory judgment proceeding against the State, *viz. National Indemnity Co. v. State of Montana*, District Court for the State of Montana, Cause No. XDDV 2012-140 ("**DJ Action**"), seeking a ruling that NICO "had and has no duty to defend or indemnify" the State for any of the Libby Claims, past or present, and seeking reimbursement of "all money [NICO] paid in connection with the defense of settlement of any Underlying Actions which are outside the Policy."

57.    The State counterclaimed in the DJ Action for breach of contract.  In particular, it alleged that NICO had breached its duty to defend by failing to "provide a prompt and proper response" to the State's tender of its defense of the Libby Claims, and that NICO had also breached its duty to indemnify under the *Policy*.

58.    By September 2015, the State notified NICO of 860 additional Libby Claims that had not been included in the November 2009 global settlement.

59.    Both NICO and the State, following discovery, moved for summary judgment in the DJ Action.  In a series of rulings, the trial court held that:

A.    NICO did not breach its duty to defend in 2002 because the State did not clearly tender its defense of the Libby Claims to NICO;

B.    After the State properly tendered its defense in 2005, NICO breached its duty to defend by conditioning that defense on a *pro rata* allocation of defense costs, thereby estopping NICO from denying coverage or asserting any other coverage defenses, and thus resulting in NICO being obligated to pay defense costs and completed settlements on Libby Claims for which it had not provided a full defense as of the date each such settlement was approved by the court;

C.    Beginning in May 2006, NICO offered a full defense subject to a reservation of rights, and did not breach the duty to defend for claims thereafter tendered as a consequence of such reservation;

D.    Nevertheless, NICO again breached the duty to defend because it failed to seek resolution of coverage issues by expeditiously filing a declaratory judgment action after the State rejected NICO's offer to defend, and instead waited until February 23, 2012 (after the 2009 global settlement). The result of such delay was that NICO was estopped from raising any *Policy* defenses and was obligated to pay all post-May 2006 claims tendered to it and settled by the State prior to February 23, 2012;

E.    NICO was not estopped from raising coverage defenses for post-May 2006 tendered claims that were not settled as of February 23, 2012, and which were tendered after that date (essentially all future Libby Claims), and, as to such claims, the DJ Action was timely; and

F.    NICO's coverage defenses were generally rejected, with the *Policy* being applied "to the extent the claimant was 'exposed to asbestos during the Policy period.'"    The trial court also determined that each Libby Claimant's exposure during the policy period, as well as the additional exposure over time, constituted a separate occurrence for purposes of the *Policy's* limits.

60.    The trial court declined to address NICO's objections to the reasonableness of any settlements, or the fees or costs associated therewith, because NICO did not raise those issues at the time the settlements were approved.

61.    Finally, the trial court ordered NICO to pay all of the State's defense costs, including attorney fees and pre- and post-judgment interest on all properly tendered claims, as well as costs and attorney fees incurred by the State in defending the DJ Action.

62.    The result of these rulings was that the trial court entered judgment in August 2019 against NICO for $97,833,193.39.  This amount consisted of $26,800,000 for the remainder of the November 2009 global settlement (with NICO getting credit for the $16.1 million it contributed), and $21,285,900 in accompanying prejudgment interest; $29,589,933.86 to indemnify the State for settlements paid during the *Policy* period, and $4,861,904.98 in accompanying prejudgment interest; $6,872,918.69 for the State's attorney fees and costs paid from July 18, 2005 through June 5, 2019; $4,902,120.42 for prejudgment interest on the State's defense costs; and $3,570,410.44 for State's fees and costs incurred in defending the DJ Action through March 29, 2019.[1]

---

[1] The described amounts actually total $97,883,188.39.  Nevertheless, according to the *Decision* (as hereinafter defined), the amount of the judgment was as stated above.

X.    **NICO's Appeal**

63.    NICO timely appealed the trial court's ruling in the DJ Action, challenging all of its determinations.  The State likewise cross-appealed those rulings of the trial court adverse to it.

64.    The appeal was argued on November 20, 2020, and the Montana Supreme Court issued its decision On November 23, 2021 ("***Decision***").

A.    **The *Decision* Addresses NICO's Alleged Breaches of its Duty to Defend**

65.    The *Decision* determined that, as regards the 2002-2005 timeframe, NICO did not breach its duty to defend under the *Policy* because the dismissal in the *Orr* Proceeding had already been argued and, in effect, there was nothing more for NICO to do at that point in time.

66.    The *Decision* also determined, however, that NICO breached its duty to defend in 2005 when it agreed to defend *subject to* a condition, namely, that NICO's participation in the State's defense be limited to a *pro rata* allocation of time on the risk (which NICO defined as "the two-year Policy period").  As the *Decision* recognized, "[t]here is no dispute the Libby Claims, premised upon the State's asserted negligence, implicated potential coverage" under the *Policy*, and NICO's "clear attempt to limit its defense responsibility to a pro rata portion of these claims violated the Policy and the duty to defend."

67.    The *Decision* also affirmed the trial court's determination that, subsequent to NICO's May 10, 2006 letter to the State, which letter removed the prior condition regarding the State's participation in a *pro rata* sharing of defense costs, NICO did not breach its duty to defend by merely reserving its rights in that regard.  That said, the *Decision* then affirmed the trial court's ruling that NICO again breached its obligation to defend by "failing to file a

declaratory judgment expeditiously when the State rejected [NICO's] offer to defend each of the Libby Claims tendered and waiting until after the first global settlement" to do so.

        **B.**      **The *Decision* Addresses NICO's Breaches and the Resulting Estoppel**

68.      Having determined that NICO had, at various times, breached its duty to defend the State, the *Decision* next held that, as a consequence, NICO was estopped from raising any coverage defenses that might otherwise be available under the *Policy*.

        **C.**      **The *Decision* Addresses the Consequences of NICO's Breaches of its Duty to Defend**

69.      The *Decision* affirmed the trial court's ruling that, as a consequence of NICO's first breach of its duty to defend (which the trial court found to have occurred on July 18, 2005), NICO was responsible for all defense costs and completed settlements incurred "subsequent to that date" for which "[NICO did] not provide[ ] a full defense as of the date each settlement was approved," without regard to coverage defenses and "irrespective of Policy limits."

70.      The *Decision* also affirmed the trial court's ruling that, as a consequence of NICO's second breach of its duty to defend (which the trial court found to have occurred as a result of NICO's failure to expeditiously file a declaratory judgment action (such action ultimately having been filed on February 23, 2012)), NICO was "estopped from raising coverage defenses, and is responsible for defense costs and all settlement amounts" as to "those claims which were tendered and settled prior to February 23, 2012." The *Decision* thus estopped NICO from asserting coverage defenses. It also assessed defense costs, with interest, on claims the State defended without a full defense offer from NICO during that same period. Finally, the *Decision* also assessed settlement costs, again for that same period.

### D.    The *Decision* Addresses Coverage Issues

71.    The trial court withheld certain claims from its application of estoppel, and permitted NICO to raise defenses under the *Policy* as regards those claims. In particular, the trial court held that claims "tendered subsequent to May 10, 2006" for which NICO "offered a full defense" were not subject to estoppel. Likewise, claims tendered "but not settled or reduced to judgment prior to February 23, 2012" were not subject to estoppel as regards settlement costs. After ruling that NICO could, as regards this limited set of claims, present its coverage defenses, the trial court then held that most of those defenses were not viable.

72.    In particular, the trial court found that the Libby Claims did not constitute a "known loss." It likewise found that the *Policy's* pollution exclusion was not applicable. The *Decision* upheld these determinations, albeit on different grounds.

73.    Additionally, the trial court held that the State did not intend or expect injuries to be sustained as a result of its actions and, as a result, the same qualified as an "occurrence" under the *Policy*. The *Decision* affirmed this determination.

74.    As regards the number of occurrences, the *Decision* held that "the acts of the insured constituting the 'relevant events' [were] the State's failure to warn the Libby Claimants of their hazardous exposure to asbestos," not the "number of occasions when injury [was] caused" as the trial court had reasoned. Because the record was insufficient to make this determination, this particular aspect of the DJ Action was remanded for further proceedings.

75.    The trial court also found, and the *Decision* affirmed, that "the State [was] not required to share pro rata responsibility for payment of amounts covered under the policy."

76.     Finally, as regards the question of the appropriate policy period, the *Decision* determined that the relevant question was whether injury occurred during the periods of time that the *Policy* was in force.  Given the absence of a developed factual record, this issue was again remanded.

### E.     The *Decision* Addresses Prejudgment Interest

77.     The *Decision* affirmed the trial court's ruling that, as a result of its failures to defend, NICO was liable for pre-judgment interest on the settlement amounts and defense costs assessed against it in consequence of those breaches. Additionally, the *Decision* affirmed the trial court's ruling that, as regards the indemnity payments it determined to be owed for fully defended claims, NICO was also responsible for pre-judgment interest on those payments (again as a consequence of NICO's breach of the duty to indemnify the State for these claims), as well as attorney fees and costs.  Finally, the *Decision* affirmed the trial court's imposition of pre-judgment interest on all settlements for which NICO was responsible, whether by reason of breach of the duty to defend or under indemnity coverage, such interest accruing from the date such settlements were court-approved.

### XII.    <u>NICO and The State Settle All of the Libby Claims</u>

78.     On or about April 19, 2022, NICO and the State each executed the Agreement.

79.     By email dated April 21, 2022, NICO advised Global that NICO and the State were "in the next two weeks" seeking court approval of the *Agreement* and that "a reinsurance billing will be submitted after court approval is received."

## COUNT ONE
## DECLARATORY JUDGMENT AS TO APPLICATION OF THE RELEVANT STATUTE OF LIMITATION

80.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1-79, each as if fully set forth herein.

81.    On or about January 28, 2011, NICO advised Global that NICO would be required to make a $16.1 million payment towards settlement of the Libby Mine Claims, and would thereafter seek reimbursement under the Global Certificate.

82.    NICO paid $16.1 million to the State on September 30, 2011, and formally demanded payment of Global's purported share of the payment on October 20, 2011.

83.    Global rejected NICO's demand for payment, and NICO did not initiate suit with respect thereto.

84.    Pursuant to the applicable statute of limitations, any claim that NICO may have had relating to amounts demanded by it from Global on October 11, 2011, including any claim for interest, is untimely and barred by such statute.

85.    An actual and justiciable controversy exists with respect to the application of the statute of limitations to this aspect of NICO's claim.

## COUNT TWO
## DECLARATORY JUDGMENT AS TO LATE NOTICE

86.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1-79, each as if fully set forth herein.

87.    The State tendered the Libby Claims to NICO no later than June 2002.

88.    Notice of such claims was not given by NICO to Global until years later.

- 18 -

89.     The *Global Certificate* requires that NICO provide prompt notice of any claim "when notice of claim is received by" NICO.

90.     NICO's notice of the Libby Mine Claims was not prompt, and an actual and justiciable controversy exists as to the legal effect of that failure.

## COUNT THREE
## DECLARATORY JUDGMENT AS TO EXTRA CONTRACTUAL LIABILITY

91.     Plaintiff hereby incorporates the allegations set forth in paragraphs 1-79, each as if fully set forth herein.

92.     In the *Decision*, the Montana Supreme Court affirmed the trial court's ruling that, as a result of NICO's breaches of its duty to defend the State, NICO was estopped from raising coverage defenses to certain of the underlying Libby Claims, and thus to the settlements that the State entered into to resolve those claims.

93.     The *Global Certificate* does not contain any provisions that provide for reimbursement of NICO's extra-contractual obligations or reimbursement in excess of policy limits.

94.     An actual and justiciable controversy exists as to the whether the amounts that NICO agreed to pay under the *Agreement* are reimbursable under the *Global Certificate* in light of the breach and estoppel findings set forth in the *Decision*.

## COUNT FOUR
## DECLARATORY JUDGMENT AS TO PREJUDGMENT INTEREST AND STATE'S DECLARATORY JUDGMENT COSTS

95.     Plaintiff hereby incorporates the allegations set forth in paragraphs 1-79, each as if fully set forth herein.

96.     The trial court's judgment against NICO in the amount of $97,833,193.39 in August 2019 consisted of $26,800,000 for the remainder of the November 2009 global settlement (with NICO getting credit for the $16.1 million it contributed), and $21,285,900 in accompanying prejudgment interest; $29,589,933.86 to indemnify the State for settlements paid during the Policy period, and $4,861,904.98 in accompanying prejudgment interest; $6,872,918.69 for the State's attorney fees and costs paid from July 18, 2005 through June 5, 2019; $4,902,120.42 for prejudgment interest on the State's defense costs; and $3,570,410.44 for State's fees and costs incurred in defending the DJ Action through March 29, 2019.[2]

97.     Because the *Global Certificate* does not contain any language establishing Global's responsibility for prejudgment interest, or for the State's declaratory judgment costs in connection with NICO's litigation with the State, an actual and justiciable controversy exists as regards such amounts.

## <u>COUNT FIVE</u>
## DECLARATORY JUDGMENT THAT GLOBAL IS NOT REQUIRED TO FOLLOW-THE- SETTLEMENTS UNDER THE *GLOBAL CERTIFICATE*

98.     Plaintiff hereby incorporates the allegations set forth in paragraphs 1-79, each as if fully set forth herein.

99.     In the Decision, the Montana Supreme Court affirmed the trial court's ruling that, as a result of NICO's breaches of its duty to defend the State, NICO was estopped from raising coverage defenses to certain of the underlying Libby Claims, and thus to the settlements that the State entered into to resolve those claims.

---

[2] *See* footnote 1, *supra*.

100.    Under the *Global Certificate*, Global is required to indemnify NICO for loss settlements made by NICO "***provided*** they are within the terms and conditions" of the *Global Certificate*.

101.    The *Global Certificate* does not contain a follow-the-settlements provision or any other similar provision.

102.    Because of the absence of such a provision here, an actual and justiciable controversy exists as to the whether Global is required to follow the settlements under the *Global Certificate*.

**COUNT SIX**
**REQUEST FOR DECLARATORY JUDGMENT**

103.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1-79, each as if fully set forth herein.

104.    A ripe and justiciable controversy exists between the parties regarding Global's obligations, if any, to NICO under the *Global Certificate* to indemnify NICO for any loss or loss expense incurred by NICO under the *Policy*.

105.    Global seeks a judicial declaration regarding the parties' rights and obligations under the *Global Certificate* in connection with or arising out of any loss or loss expense actually incurred by NICO under the *Policy*.

**Prayer For Relief**

WHEREFORE, Global Reinsurance Corporation of America, as successor-in-interest to Constitution Reinsurance Corporation, prays for judgment as follows:

**As to all counts:**

A.    The entry of a judgment declaring that Global does not have an obligation under the *Global Certificate* to reimburse NICO for the settlement with the State pursuant to the *Agreement*; and

B.    The entry of a judgment awarding Global its attorneys' fees, costs and disbursements, and granting it such other and further relief as the Court may deem proper.

**As to Count One:**

A.    The entry of a judgment declaring that, as regards the claims referenced in such count, the same are barred by the applicable statute of limitations;

B.    The entry of a judgment awarding Global its attorneys' fees, costs and disbursements, and granting it such other and further relief as the Court may deem proper.

**As to Count Two:**

A.    The entry of a judgment declaring Global's rights, duties, obligations and responsibilities under the *Global Certificate* given NICO's failure to timely furnish Global, or its predecessors-in-interest, with timely notice of the State's claims under the Policy;

B.    The entry of a judgment awarding Global its attorneys' fees, costs and disbursements, and granting it such other and further relief as the Court may deem proper.

**As to Count Three:**

A.    The entry of a judgment declaring Global's rights, duties, obligations and responsibilities under the *Global Certificate* given the estoppel referenced in such count, and NICO's resulting responsibility for extra-contractual damages and/or damages in excess of the *Policy's* limits;

B.    The entry of a judgment awarding Global its attorneys' fees, costs and disbursements, and granting it such other and further relief as the Court may deem proper.

**As to Count Four:**

A.      The entry of a judgment declaring Global's rights, duties, obligations and responsibilities under the *Global Certificate* inasmuch as such certificate does not contain any language establishing Global's responsibility for prejudgment interest, or for the State's declaratory judgment costs in connection with NICO's litigation with the State;

B.      The entry of a judgment awarding Global its attorneys' fees, costs and disbursements, and granting it such other and further relief as the Court may deem proper.

**As to Count Five:**

A.      The entry of a judgment declaring that Global has no obligation to follow-the-settlements and, as such, is free to challenge the reasonableness of the settlement envisioned in the Agreement;

B.      The entry of a judgment awarding Global its attorneys' fees, costs and disbursements, and granting it such other and further relief as the Court may deem proper.

**As to Count Six:**

A.      The entry of a judgment declaring the parties' rights and obligations under the *Global Certificate*;

B.      The entry of a judgment awarding Global its attorneys' fees, costs and disbursements, and granting it such other and further relief as the Court may deem proper.


**LOCKE LORD LLP**

*/s/ Donald E. Frechette*
Donald E. Frechette
20 Church Street, 20th Floor
Hartford, Connecticut 06103
(860) 525-5065
donald.frechette@lockelord.com

and

Ernesto R. Palomo (*pro hac vice* forthcoming)
111 S. Wacker Drive
Chicago, Illinois 60606
(312) 443-0477
epalomo@lockelord.com

and

Matthew Murphy (*pro hac vice* forthcoming)
One Financial Plaza
Suite 2800
Westminster Street
Providence, RI 02903
(401) 276-6497
matthew.murphy@lockelord.com

*Attorneys for Plaintiff Global Reinsurance Corporation of America*